A few days after the hearing, the following opinion of the Court was drawn up by
Parker C. J.
Both parties, by their counsel, have been fully heard upon the question, whether the injunction moved for should be granted; and after sufficient deliberation the Court are unanimously * of opinion that the motion cannot be granted, for the reasons which will be stated.
We wish it to be understood in the outset, that the decision on this motion is wholly independent of any opinion upon the mom question hereafter to be tried, whether the act of the legislature incorporating the Proprietors of Warren bridge is valid against the Proprietors of Charles River bridge, so as to justify the diminution of their income by withdrawing travellers and passengers from the latter bridge. No such opinion has been formed, and we have purposely excluded that question *396 from our discussion upon this motion, any further than to satisfy ourselves that there was ground of controversy. And we think it will be unsafe for either party to found any hope or expectation of the final result of this hill upon the failure of the present motion, for it will be seen in the course of these remarks, that there was no occasion to go into the general merits of the case, in order to discharge our present duty, and we have not therefore thought ourselves authorized, in the ac tuai state of the proceedings, when only one party is formally before the Court (the time for answer not having arrived), to decide or even to deliberate upon a question on all hands deemed to be of magnitude and importance.
That question is of a nature not to be sought for by any one holding a judicial seat, but not to be avoided when duly and legally presented. When it assumes a shape which involves the rights and interests of corporations or individuals, it will be met with due deference to legislative authority and due regard to the constitutional rights of the citizen. We should have been glad, upon the whole, if the proceedings had been so matured that we could with propriety have passed upon the great question which is brought up by the controversy, because suspense on such occasions cannot but he injurious ; but the forms of law and the rights of parties require time and preparation, and whatever may be lost by delay in particular cases, is amply compensated by the security and stability resulting from cautious and formal deliberation.
The act of the legislature under which this bill is filed, and which gives us authority to sustain the present motion, was passed but a few months since. Until then there was no jurisdiction over waste and nuisance, except by action or indictment at the common law, or process under tire statute of 1801, c. 16. These admitted of no preventive measures, but left the subject of the complaint as it was found, until a final adjudication. The legislature without doubt saw, that in many cases public safety and private security required more prompt and efficacious relief tiran could be had in the customary mode of redress. Nuisances may affect the life, health or comfort of the citizens of a neighbourhood; the mischief threatened may be accomplished while a prosecution is pending. Regard to these *397 great objects seems to require that there should be a power to restrain as soon at least as the mischief commences ; and in regard to nuisances strictly private, — such as the unlawful interference with a pre-existing right, the interruption of light and air, the diverting or corrupting of water, the subduction of profits from a market, mill or ferry, — that where the right to the enjoyment is clear and uncontroverted, and effectual relief or compensation is doubtful, the mischief shall be stopped or even prevented by the power of the public. And this may be beneficial as well to the agent as to the sufferer, for it may protect him from an expense, which a subsequent adjudication may render wholly useless. Attributing, as we ought, a wise regard by the legislature, in their public and general laws, to the wants and well being of the community, we must suppose that it was a sense of the imperfect state of the law in the above particulars, which led to the adoption of the act in question, and if wisely administered by the judicial power, it will without doubt be found salutary.
The motion however which we are considering has been me' by a denial of the application of the statute to such a case as is presented by the bill. In other words, it is alleged that the Court, in its chancery character, has no jurisdiction over the subject, because the legislature intended to bring within the law only nuisances of a different description, those which more usually come under the denomination of common nuisances, although they may be particularly injurious to individuals.
This Court has no desire to extend its jurisdiction in equity beyond the clear and undoubted meaning of the legislature in conferring it. Hitherto we have taken none by implication. In the first case which was decided under the statute of 1817 (17 Mass. R. 327) the reasons were given for construing the grant of jurisdiction in equity to this court of common law, strictly, and the same reasons still exist. We consider each act of the legislature which has successively granted that power, as specific in its nature, and that the powers are not to be extended to cases or subjects not expressly designated, because we are bound to suppose that it was intended to limit the new *398 jurisdiction to such cases only as had been determined to require its application.
It is to be observed, however, that this jurisdiction, though limited and restrained in regard to the objects, is wholly unlimited in regard to the means of executing it, for in all the various statutes which have been enacted, plenary power is given to execute orders and decrees by all such writs and processes as may be necessary to attain the end, so that in regard to the mode of proceeding and the execution of the authority vested in any given case, the Court is restrained by nothing but by paramount law, the constitution, and is necessarily referred to the rules and forms of proceedings in other courts of equity for its guide. When the legislature give jurisdiction over any particular subject in equity, they cannot but have in view a system of equity well known in the history of jurisprudence, and known to be a branch of legal science ; for otherwise (which cannot be presumed) they must have intended to refer such subjects to the will of each particular judge who should be authorized to enforce the authority ; and therefore it becomes the duty of the Court to consult the precedents of courts of chancery of England and our sister States, as in a common law proceeding we recur to a similar source of authority or information. When the jurisdiction is doubtful, therefore, we must look to books to see whether it has been exercised by other similar tribunals, and when the subject matter of the pow er is expressed in technical words, we must ascertain the use and meaning of the terms by a similar reference.
It so happens, however, that hitherto nothing has been left to doubt and conjecture as to the subjects over which jurisdiction is intended to be conlerred. The statute under consideration is not less explicit than those which preceded it, leaving no room, we think, to doubt of the real intent of the legislature “ The justices of the Supreme Judicial Court may hear and determine in equity any matter touching waste or nuisance in which there is not a plain, adequate and complete remedy at law.”
In considering then whether any particular subject of a bill 's within the jurisdiction of the Court in this form, we have only to inquire whether it is a matter touching waste oi *399 nuisance, and then whether there is such remedy at law as falls within the restriction. Now what is or is not a nuisance is very clearly stated by the books of the common law, and among other things it is clear, that to establish without right a ferry sc near to one before rightfully existing as to draw away the passengers and diminish the profits, is a nuisance. So in regard tc markets or fairs, where they may be private property So m some cases in regard to a mill, or the obstructing oi diverting of a water-course, and many other subjects of a similar nature. Com. Dig. Action on the Case for Nuisance, A. There can, we think, be no doubt, that though bridges are not particularly named, because in ancient times when the law was settled there were none probably existing with a right to toll that were liable to interference by unauthorized persons, yet where they do exist by lawful authority, and their profits are reduced by unlawful competition, they fall within the reason of the law, and are equally protected by it as ferries, markets, &c. Therefore taking the complaint in the bill as true, which we must do on the question of jurisdiction, we entertain no doubt, that the facts alleged are “ matters touching nuisance,” which come expressly within the terms of the statute.
But it is objected that by the restrictive clause in the statute, “in which there is not a plain, adequate and complete remedy at law,” the case stated in the bill is excluded from the equity jurisdiction of the Court; if so, it must be because there is such a remedy for the grievance complained of.
The object of the legislature in using these words is, to preserve the jurisdiction of the common law in all cases where that is capable of affording substantial and adequate relief. It is plain that it is not intended to confine the cases for equity to that class only in which there is no relief at law, for by such construction the statute would be nugatory, there being no cases of an actual wrong for which some remedy at common law cannot be found. “ Wherever there is a wrong there must be a remedy,” is a maxim of the common law, and when there is no writ in the register, one will be framed to suit the case. But there are many cases in which the remedy may be defective ; that is, not adequate and complete
*400 The common law furnishes a remedy for the breach of a contract, but that is not always complete; for the strict execution of the contract may be more desirable than a compensation in money for the breach ; and the party is entitled, upon principles of right and equity, to have the thing done which is contracted to be done ; and it is the highest eulogy of a court of equity, that it can compel a performance of promises on contracts, instead of leaving the injured party to an uncertain recompense in money. So a man contracts to abstain from doing something, and the court of equity, instead of allowing him to do it and pay for his voluntary breach of faith, lays its hand on him and compels him to abstain.
These are cases where the common law furnishes a reme dy, but it is incomplete, and equity steps in to supply the defect. In short, the limitation in the statute shows an in tention to give the jurisdiction as it exists in chancery in England, for there it is only where there is no remedy at law, or only an insufficient one, that the chancery powers are in force.
Now in regard to nuisances of a private nature, though there is an action on the case for damages, it is plain that this remedy is inadequate and incomplete. The party may recover his damages, but the nuisance continues ; he may repeat his action, but still he does not remove the mischief. The offending party may be obstinate or malicious, or he may take his chance of being obliged to pay less than he can gain by the nuisance. A power to restrain him, by means which he cannot resist, would seem to be essential to the due administration of justice. And such a power is equally salutary, where one having a clear right to the use and income of property, is intercepted in the enjoyment of it by one usurping upon his rights.
To apply the principle to the case stated in the bill, taking again the facts as alleged to be true. The complainants are m the actual enjoyment of a franchise granted by the Commonwealth, yielding them a profit, for which they paid a valuable consideration, and entered into some obligations which are yet m force. The respondents, without authority, erect a bridge so near to theirs as to make it certain that their income will be *401 reduced. An action will lie for this injury, and damages may be recovered, and so toties quoties as the injury is renewed or continued. But the injury remains, the damages are uncertain, and the ability to pay is doubtful. Without doubt this is such a case as the legislature contemplated, for the remedy is Incomplete. Nothing short of an absolute prevention of the evil is a complete remedy, and a court of common law is incompetent to afford this.
But it is objected, that by this extensive construction of the statute, the parties will be deprived of their right to a trial by a juiy, which is secured to them by the 15th article of the declaration of rights. If this be the effect, the act itself is void, for the legislature cannot ordain a process by which controversies respecting property shall be ultimately decided without a trial by jury. We think however the act is not exposed to this objection, for it provides, “ that whenever it shall be necessary and proper to have any facts tried by a jury, it shall be done in such manner as the Court shall direct.” Now whenever a party in a suit in equity shall require that any controverted fact be tried by a jury, the Court, by force of the article above mentioned, (though the act is not imperative,) will be obliged to order an issue for that purpose, and thus the constitutional security is preserved. So in regard to all the preceding statutes giving jurisdiction in equity, some of which do not provide for a trial by jury, this constitutional provision must be enforced by the Court.[1]
With respect to public nuisances, which are misdemeanors, there may be more question as to the application of this statute. Certainly if proceeded against criminally, in order to obtain an abatement and the punishment of the offender, it must be done by indictment, or in some cases by information at common law, or in the manner provided in the statute before cited. But even in regard to some of these, those for instance which affect the health or comfort of a neighbourhood, since each individual is particularly annoyed, perhaps the remedy by this statute, at least so far as to procure immediate relief by injunction, is proper. But of this we give no *402 opinion, the case before us being one of a private nuisance only.
We are satisfied, for the reasons above stated, that the Court has jurisdiction of the subject matter of the bill,[2] and we proceed to inquire whether the present motion shall be granted. The motion is for an immediate injunction to restrain the respondents from building or continuing to build the bridge which is the subject of complaint in the bill. Indeed it is part of the prayer of the bill itself, that an injunction immediately issue, before answers filed or any hearing of the merits of the complaint, except those which are stated in the bill itself, supported by affidavits which sufficiently prove the principal facts.
To us, who have been used only to common law proceedings, it could not but appear a novel application, to award process in nature of an execution against a party who had been only summoned to hear a complaint against him, but whose time of appearance had not yet come. It seemed to resemble a little the course ascribed to the judge renowned in classic poetry, Castigat auditque. But upon examining chancery decisions in England and New York, we are satisfied that there are cases which require the exercise of the power of preventing, as well as compensating mischief; and confining the exercise of this power to cases like those to which it has generally been applied, it is a wholesome if not an essential branch of equity jurisdiction. The power existing in fact in those jurisdictions which have been mentioned, at the time when our statute was enacted, there can be no doubt it was intended to be conferred on this Court by that statute. Probably if it had not been expressly granted, it would have been thought necessarily to result from the jurisdiction given, “ of any matter touching waste or nuisance,” and the power to issue all writs and processes necessary to enforce that jurisdiction ; for we must of necessity have resorted to the decisions of other courts to know what was intended by the terms made use of. But to put the matter out of all question, the legislature have in *403 tho ¡ame statute enacted, “ that any one or more of the justices of this Court in term time, or in vacation, may issue writs of injunction to stay any waste or nuisance, and make such orders and decrees relative thereto, and issue such processes proper to enforce the same, as justice and equity may require.”[1]
The power therefore to issue writs of injunction for the above purpose is limited only by the judicial discretion of the court or judge, which discretion is to be enlightened and guided by the practical exercise of it by the eminent tribunals in which equity jurisprudence has been administered. Upon consulting the recorded doings and opinions of those tribunals, we find that this power of prejudging a case, so far as to prevent the continuance of an alleged mischief until the party complained of has an opportunity to answer, is but sparingly exercised, and only upon cases which hardly admit of controversy. Upon the first application to Lord Hardwicke he was startled, and said it was wholly unprecedented, and almost indignantly dismissed the motion. 2 Ves. sen. 414. But since that period injunctions have frequently been applied for, and sometimes obtained, before any trial at law or hearing of the merits, and in most, if not all of the cases wherein they have been granted, substantial justice and the security of the party aggrieved seemed to require the interposition of this saving power.
The principle on which the English courts of chancery have proceeded in the use of this extraordinary power, is urgent necessity ; to prevent the destruction of property, or such invasion of rights as will hardly admit of a full and fair recompense, if it is suffered to proceed until there can be a judicial determination of the case.
And they further require, to support such an application, that the subject matter of the complaint, that is, the property njured or menaced, or the right invaded, should be free from controversy ; for if there be a controversy, they uniformly refuse to interfere in this summary mode. Such a preliminary injunction has scarcely ever issued unaccompa *404 nied by a declaration of the extreme reluctance with which it is granted; and well it may be so, for it is to a certain extent deciding the cause upon a hearing of one party only ; which is so contrary to the' common principles of justice, that nothing but extreme necessity will justify it. Chancellor Kent, in one of his decisions, says, “ it must be a strong and mischievous case of pressing necessity, or the right must have been previously established at law, that will entitle the party to this relief.” 3 Johns. Ch. R. 287. And in another, “ that the process of injunction is too peremptory and powerful in its effects to be used without the clearest sanction, and that he should better consult the stability and the utility of the powers of the court of chancery, by not stretching them beyond the limitation prescribed by the precedents.”
Coming to the exercise of this jurisdiction, hesitatingly and sparingly conferred by the legislature, so recently as we have done, and accustomed as we have been to the restraints of the common law, it cannot be -expected that we shall be more ready to extend power by construction, than those who have been long familiar with this useful though somewhat indefinable branch of jurisprudence. Our statute, it is true, gives general power to issue writs of injunction to stay waste and nuisance, but the very generality of the terms implies a limitation by some known course of proceedings in similar tribunals. Many cases have been cited in the argument, but the result of them all seems to be, as expressed in the words of Eden, “ that though the court is in general averse to interfering before a trial, yet if a case of nuisance is clearly made out upon affidavit, it will nevertheless be granted or continued until such trial shall have been had.” Eden on Injunctions, 237.
And this rule has been adopted in several cases which have occurred since the enactment of our statute. An actual nuisance has been proved to exist, and it was manifest that the continuance of it until a trial could take place, would expose the health if not the lives, and certainly destroy the comfort of a neighbourhood. Such cases were, without any doubt, "ontemplated by the legislature as proper subiects of *405 this restraining power, and all will admit, in regard to these, that this act of the legislature was called for by a due regard to the health, comfort and convenience of the citizens.
And it seems to follow as a just and necessary inference from this rule, that in certain cases where the nuisance does not yet exist, but preparations are made to create it, and if suffered to be completed it will produce great and irreparable mischief, a preventive power should be exercised, and ihe party kept from advancing until his right shall be established to do what he has undertaken. On this branch of the power there has been doubt, and the existence of it has been denied in argument ; but considering its salutary nature, and that it has been exercised in England for a long series of years, and in the chancery court of New York, we think it was within the intent of the legislature, that the power of this Court in regard to injunctions should be no otherwise restrained than by sound legal discretion in the judge who may be called to administer it.
It is seen then, that by the construction given to this act of the legislature, the present application for an immediate injunction is to be determined in some measure by our opinion of the necessity which exists for it in this particular case. The case to be made out is, that from the facts stated in the bill, it is manifest and clear that the completion of the undertaking will necessarily and unavoidably create a nuisance to the plaintiffs, that is, that it is clear that they have a right by virtue of their charter, or of their derivative right to the ferry from Harvard College, to the exclusive privilege of transporting passengers between Charlestown and Boston over their bridge, or such one as they may construct, or at least that they have the exclusive right to the transportation of those who may pass over the new bridge, if that shall be erected. Now if this be true as stated, it is a proper case for immediate restraint, upon the principles above recognised; but the exclusive right, which is the turning point of the case, is denied by the respondents. They say that there is no express grant of exclusive right in the charter, and that such right is not to be inferred as an implied covenant, but that all that was granted was *406 a license to build a bridge across Charles river at the ferry ways, and that any succeeding legislature, acting with a view to public convenience or necessity, had the same right to grant another bridge as the legislature of 1785 had to grant the first. They' therefore claim a right to do what they are complained of for doing, and what the Court is called on to restrain, under legislative authority ; which indeed is set forth in the plaintiffs’ bill.
Now can we say it is clear and incontrovertible, that the act under which the respondents are proceeding is unconstitutional and void, because it impairs the contract supposed to be contained in the former act ? We may come to this conclusion after a full hearing and due deliberation, and if we shall, our duty will be clear and the disposition to do it unshackled ; for no one can doubt that the constitution is above any legislative act.
Again, it is said the right of the plaintiffs is clear, because the place where they have built their bridge is the site of an ancient ferry, formerly belonging to Harvard College by grant from the government, and transferred by the college to them. But on the other side it is said, that there is no transfer of such right; that the provision in their charter for the annual payment of =6200 to Harvard College, amounts only to a • compensation provided by the legislature for the temporary loss of the ferry, by means of the bridge they had authorized; and that this, though consented to, and receiv ed by the college, transferred no right, but was only a satis faction for damages. Can we say that this is so clear and incontrovertible as to authorize us to proceed in this summary and ex parte manner ? We think there may be a question on both points, and therefore, within the decided cases, we ought to refuse the motion so far as it depends upon these grounds.
Again, it is said, that by their charter there is secured to them the enjoyment of toll from all passengers who would cross their bridge, if the new one should not be erected; and that admitting the legislature have the power to authorize another bridge if the public necessity and convenience should require it, yet as thereby their property will be af *407 ected and impaired, there was no authority in the legislature thus to interfere without providing an indemnity for their loss. The principle is clear and incontrovertible ; it is founded on an express provision in the declaration of rights, and would be required by the everlasting principles of justice, and of the social compact, even if it had not been expressly sanctioned. But is it as clear and incontrovertible, that the case of the plaintiffs comes within the principle ?
This depends on the former question, what was the grant, what was the contract; was it of an exclusive privilege to any extent, which is invaded by the new act ? If so, the act is invalid, for it provides no indemnity. [1] If not so, there is no case for the application of the principle. The plaintiffs certainly make out a very strong case of exclusive right, by implication ; but it is contended on the other side, as before, that no exclusive property was granted ; that the public. necessity required a new bridge ; that the legislature alone could judge of this necessity; and that they have determined the question. Now here is certainly a case of very serious controversy ; and although we may hereafter, if it should become our duty, decide that this was a proper case for indemnity, we think it does not become us, on a question discretionary in its nature, to decide so promptly against a deliberate act of the legislature, as we must do by granting this motion. It is enough for us to see, that there is room for argument, to authorize, and indeed to require us, to withhold the process prayed for. And in thus deciding, we do not certainly go counter to the decision of the courts of chancery in England or New York.[1]
It is said that whenever a person is in the enjoyment of any purchase or privilege under a legislative or government grant, *408 being in actual possession, the practice is to grant an immediate injunction against any who shall disturb or threaten to disturb him. We do not refuse to acknowledge this to be a correct rule; and the cases cited to support it sufficiently show the extent and application of it. They are most generally cases of patent and copy rights ; and in those, the right in the party seeking relief is considered quasi of record, and the extent of the right invaded is clearly defined ; and besides, the mischief of suspense would be irremediable to a considerable degree. But even in such cases, a long possession and exercise of the right under the patent or law is required to be shown. 3 Meriv. 622, 624, 628 ; 4 Ves. 130.
Is the case before us so like these cases as to require the same adjudication ? Of what are the plaintiffs in possession P of an exclusive right to take toll from all persons who pass-Charles river, between Charlestown and Boston ? or of the right to take toll only of those persons who shall actually pass their bridge ? Now the solution of this question depends upon the determination of the first, what is their grant, their contract, what rights did it confer ? To say that they were in the actual possession of the franchise of toll from all travellers who should go through Charlestown to Boston, is pelitio principii, an assumption of the very thing in controversy.
Upon the whole then we are satisfied, that, this is not one of those clear and uncontroverted cases of nuisance which form a class for the operation of the summary process sought for.
The case cited in the argument which comes nearest to this, is that of Gardner v. Newburgh, 2 Johns. Ch. R. 162. There the injunction was against persons acting under a legislative act, because they were about taking away a valuable privilege from the complainant for a purpose of a public nature, the act making no provision for indemnity. The private property was clear and uncontroverted, and it was equally clear that the legislative act was void against the complainant. This was decidedly a proper case for the exercise of this power. In the case before us, the very property said to je threatened, is denied. The bill itself shows it is denied. We cannot prejudge the question.
*409 ¡So in the case cited, where an injunction was granted against commissioners who had exceeded their authority. The common principle is, that where officers of the government have authority to take or meddle with the property of a subject or citizen in a special manner or to a limited extent, in whatever they may do in any other manner or to a greater extent they are not protected, and they may be treated as trespassers. But the case before us is, where the respondents act within the authority granted, and the question, which certainly must always be a serious one, is whether that authority is void.
There is however another class of cases in which injunctions are sometimes granted without trial, though the fact of nuisance or injury may not be uncontroverted ; and that is when the delay or allowing the-mischief complained of to continue, will produce destruction of the property, without any sure means of compensation for the loss. As in some cases of waste ; some of repeated and continued trespasses ; some interruptions of enjoyment or of property, where compensation in money will be inadequate, or uncertain on account of the inability of the party to pay. And this has been supposed to be such a case, because, it is said, if this bridge should be finished and open for travel, it is so situated that a portion, probably a large portion, of the income of the complainants will be withdrawn, and their remedy at law will be inconvenient on account of the multiplicity of suits which will be necessary, and the limited responsibility of the respondents as a company. This we think, under the circumstances of the case, might be good ground for the interposition prayed for, if the apprehensions of the complainants were well founded. But we think the danger does not exist, and that if the case should be finally made out, the remédy will be perfect and complete. In the first place, if the act under which the respondents are erecting the bridge is void, it is a nullity, and the individuals composing the company will all be liable, to the extent of their property, in suits at common law. -But such suits will not be necessary, except for so much toll as may be lost between the opening of the bridge and the final adjudication ; for this injunction, as Chancellor Kent says, is a prompt and powerful engine, and is accompanied with penalties which may be in *410 creased until the object is accomplished ; and in addition to this, there is no doubt that a forcible abatement by the power of the Commonwealth will be awarded by this Court under this bill, if the bridge shall be found to be a nuisance ; there is then no necessity for anticipating measures. Festina lente is never more proper than in judicial questions on conti averted rights.
We conclude as we began, by a caution to the parties, and to others interested in the question, to all who may wish to speculate on the result, or whose projects and schemes are connected with the maintenance or overthrow of the bridge, that we consider the question of the validity of the grant or charter of the new bridge as open and undecided as it was before this motion was made.
Such things as were proper for us to decide, we have decided. We have given the construction of the statute. We have determined that we have jurisdiction of this case. On these points the case can never be argued better than it has been, and therefore we decide. On the great question we have purposely kept our minds free, because the time has not come to hear or decide.
If the complainants think this hard, we say, as did Lord Hardwicke when he dismissed a similar motion — “In a plain case of waste or nuisance an injunction may be granted before answer, because the court will not suffer it to go on to prejudice the party in the mean time, but will stop it before hand ; but now you come in a very special and particular case. As you have given them notice by filing your bill, and stronger notice by this motion, if they do wrong it is at their own peril, and it might be ground for the court to order their building to be pulled down.” [1]

 Wilde J was present in consultation, but not at the hearing.

 See Revised Stat. c. 106, § 6 ; Charles River Bridge v. Warren Bridge, 7 Pick. 367 et seq.

 See Revised Stat. c. 81, § 8; Bemis v. Upham, 13 Pick. 169

 See Revised Stat. c. 106, § 7, 8, 9.

 See Comins v. Bradbury, 1 Fairfield, 447, 2 Kent’s Comm. (3d ed.) 339; Enfield Toll Bridge Co. v. Connecticut River Co. 7 Connect. R. 49; Case v Thompson, 6 Wendell, 637; Baker v. Boston, 12 Pick. 184; Boston and Roxbury Mill Corp. v. Gardner, 2 Pick. (2nd ed.) 39, note 2; Charles River Bridge v. Warren Bridge, 7 Pick. 519 et seq., 471; Wellington et al. Petitioners, 16 Pick. 87.

 See 2 Story’s Comm. Eq. 204 et seq.; Gibson v. Tilton, 1 Bland, 355.

 See Charles River Bridge v. Warren Bridge, 7 Pick. 344; Enfield Toll Bridge Co. v. Connect. River Co. 7 Connect. R. 28; Piscataqua Bridge v N. H. Bridge, 7 N. Hampsh. R. 57